THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DEBORAH R. CLARK,<br><br>    Plaintiff,<br><br>v.<br><br>QWEST DISABILITY PLAN,<br><br>    Defendant. | NO. C07-5222 RBL<br><br>ORDER FOR ORAL ARGUMENT |

## I. INTRODUCTION

This matter is before the Court on cross motions for summary judgment. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file herein. In light of the Ninth Circuit's recent holdings in *Abatie* and *Saffon*, and for the reasons set forth below, the Court orders oral argument.

## II. BACKGROUND

Qwest Communications International, Inc. provides disability income continuation benefits to participating employees through the Qwest Disability Plan ("the Plan"). The Plan is self-funded by Qwest Communications, but administrative responsibilities have been delegated to a third-party administrator, the Reed Group. [AR 1108; Dkt. #17] The Reed Group administers the Plan under the name "Qwest Disability Services." The Reed Group and Qwest Disability Services are hereafter referred to collectively

as "Qwest."  The Plan provides both short-term and long-term benefits to participating employees. Neither party disputes that the Plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.

Deborah R. Clark has been a Qwest Communications employee since 1981. [AR 0010] At the time of her departure from the company, she was employed as a "Load Specialist" and was earning $43,665.30 per year. [AR 0010] She initially took leave and began drawing short-term benefits in late 2004. [AR 0011] Her reasons for doing so included various ailments, such as Bell's Palsy,[1] hepatitis, alcohol dependency, cirrhosis of the liver, and pneumonia. [AR 0012]  Ms. Clark was preparing to return to work in May of 2005, but was prevented from doing so when she injured her lower back while bowling. [AR 0021-23; 0151] Ms. Clark was diagnosed with a spinal fracture, which led to successive back surgeries on June 29, August 25, and October 24, 2005. [AR 0078-81; 0111-12]  In October 2005, Ms. Clark exhausted her short-term benefits under the Plan and began the transition to long-term benefits.[2] [AR 0095]

In March 2006, after she had been collecting long-term benefits for six months, Ms. Clark's claim was reviewed by Qwest to determine continued eligibility. As part of this process, Dr. Blair (one of Ms. Clark's treating physicians) completed a "Physical Capacities Evaluation for Sedentary Jobs" form supplied by Qwest. [AR 0076] He checked boxes indicating that Ms. Clark was limited to one hour per day of each of the following activities: sitting, standing, walking, or using a computer. [Id.]  He marked on the form that these restrictions were permanent. [Id.] Dr. Blair also completed a "Health Care Provider's Statement of Disability" form, in which he indicated his belief that Ms. Clark was totally disabled and that she would not benefit from vocational rehabilitation. [AR 0077] His explanation for the total disability read: "Patient underwent several fusion operations for a spinal fracture and still has significant pain." [AR 0077] Dr. Blair checked another box on this form indicating that "the ability to return to work in some capacity [was] included in the treatment goals[.]"  Based on the records and opinions of Ms. Clark's treating physicians,

---

[1] Bell's palsy is a paralysis of the facial nerve producing distortion on one side of the face.  When it is not attributable to any known cause (such as a stroke), the symptom is named for Sir Charles Bell, the Scottish anatomist who first described it.

[2] Ms. Clark's employment was apparently terminated contemporaneously with this transition. She was informed that in order to qualify for long-term benefits, she would have to be removed from the Qwest Communications  payroll with no guarantee of re-employment. [AR 0499]

ORDER
Page - 2

her claim was approved for an additional six months. [AR 0471]

In the meantime, Qwest referred Ms. Clark to "Advantage 2000 Consultants," an independent agency that helps claimants and long-term disability administrators secure Social Security Disability benefits. [AR 0025] Qwest presumably did this because, under the terms of the Plan, disability payments made by Qwest Communications would be offset by any Social Security award. [AR 1125] In July 2006, Ms. Clark was approved for Social Security Disability benefits, which were awarded retroactively from an entitlement date of October 2005. [AR 0725] Qwest then demanded repayment from Ms. Clark in the amount of $10,271.54, a figure which represented the amount of the Social Security award from October 2005 through August 2006.[3] [AR 0463]

Also in August 2006, the claims administrator initiated the second six-month review of Ms. Clark's claim by mailing her a "Continuance of Disability Claim" form.[4] [AR 0458-60] This was never returned, and Qwest followed-up with two additional letters and a voice mail. [AR 0038; 0454-57] When Ms. Clark failed to respond, Qwest denied her claim effective October 1, 2006. This denial was based on Ms. Clark's failure "to submit objective medical documentation[.]" [AR 0063-64]

On January 9, 2007, Qwest informed Ms. Clark via phone that her "claim [was] in a denied status for failure to comply with the review process" and advised her of her right to appeal. [AR 0039] Three days later, Ms. Clark contested Qwest's denial in a strongly-worded handwritten notice.[5] [AR 0425] Shortly thereafter, she retained an attorney, and he sent Qwest his notice of appearance. [AR 0004-05] On

---

[3] According to Ms. Clark, her award was delayed because it could not be processed without a copy of her birth certificate, which she could not afford to have reproduced. [AR 0039]

[4] The Plan contains two definitions of "disabled," the second of which applies after a participant has been receiving long-term benefits for twelve months. [AR 1099] Thus, the August 2006 review would have been conducted under a less-inclusive definition of "disabled" than had previously applied.

[5] To Whom it May Concern                                              Susan Macken

 I wish to ask for a review of denial of my disability benefits. I do not agree with your findings. Having three operations on my back in a matter of 8 months has pulled the rug out from under my feet. Dr. Blair said he could fix my back, but he didn't. I cannot even stand for 5 minutes doing anything without being in pain. I can't even waddle to my mailbox without help. The only time I am OK is laying [sic] down. I did not ask for this. I loved my job, I loved working, now I am good for nothing. I would like all the documentation pertaining to my case. Also if need be I will retain an attorney to fight this denial.

 /s/ Deborah Clark

appeal, Qwest allowed Ms. Clark forty-five days to submit additional medical records supporting her claim. [AR 0003] Through her attorney, Ms. Clark then supplied Qwest with additional medical documentation to the effect that Ms. Clark had been suffering from Osteoporosis, spinal disease, post-surgical complications, and ongoing low back pain.[6]  [AR 0269; 0279-96] It appears from those records that Ms. Clark had last sought treatment for her back on May 17, 2006. [AR 0279]

Qwest subsequently forwarded these records to "Reed Review Services" ("RRS") for the administrative appeal, seeking a determination as to whether Ms. Clark was totally disabled under the Plan, and – if she were not – identifying any and all appropriate job restrictions. [AR 001] Ms. Clark's file was then reviewed by an in-house physician at RRS.  On March 21, 2007, that physician produced a written report concluding that Ms. Clark could work, with the only job limitation that she be allowed time for "back stretching and change of position as needed." [AR 0053]

Then, on March 22, 2007, RRS requested a "Transferrable Skills Analysis" based on the stretching and change-of-position restrictions recommended by the RRS report. [AR 0432] Genex Services, Inc. completed the skills analysis on March 24, 2007,  identifying several jobs Ms. Clark could work and concluding that she was "capable of earning greater than 60% of her base pay amount."[7] [AR 0041-46] Qwest then upheld its denial of Ms. Clark's claim, relying primarily on the report from the in-house doctor at RRS and the skills analysis completed by Genex. [AR 0047-50]

On May 3, 2007, Ms. Clark filed suit in this Court requesting an award of benefits and recovery of her attorney's fees. [Dkt. #1]  This Court has jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  *See Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1009 (9th Cir. 1997).

### III. DISCUSSION

**A.  What additional discovery, if any, will be necessary to determine the appropriate standard of review?**

To determine the applicable standard of review in an ERISA case, the starting point is the wording of the plan. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962-63 (9th Cir. 2006) (en banc).  When

---

[6] Also submitted were records detailing gastrointestinal issues and a rib fracture.

[7] To remain eligible for continued benefits under the terms of the Plan, Ms. Clark would have had to show that she was incapable of earning 60% or more of her base salary. [AR 1099]

ORDER
Page - 4

a plan does not confer discretion on the administrator to determine eligibility for benefits or to construe the terms of the plan, a court must review the denial of benefits de novo. *Id*. at 963. Conversely, where the terms of the plan *do* confer discretionary authority, the standard of review shifts to abuse of discretion. *Id*. In that case, the Court should set aside the decision of the plan administrator only when the decision is arbitrary and capricious, meaning that it is not grounded on any reasonable basis. *Jordan v. Northrop Grumman*, 370 F.3d 869, 875 (9th Cir. 2004).

Both parties agree that the language of the Plan confers full discretion to the Plan administrator to determine benefits, and both therefore conclude that this Court should review the denial of Ms. Clark's claim for an abuse of discretion. [Dkt. #15, p. 5; Dkt. #16, p. 14] *See also Sawiers v. Qwest Disability Services, Inc.*, 413 F.Supp.2d 1030, 1038 (D.Minn. 2006) (holding that the language of the Qwest Plan confers discretion). But the inquiry does not end there. In the Ninth Circuit, ERISA abuse of discretion review is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Abatie,* 458 F.3d at 967. Regardless of the conflict of interest, the administrator's decisions are usually reviewed for an abuse of discretion standard, *id*. at 965; however, this standard of review is "indefinite" and is substantially similar to the "sliding scale" approach adopted by some other circuits.[8] *Id*. at 967-69.

However, even if the language of a plan grants discretion, the court reviews de novo when "an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well[.]" *Id*. at 971. Similarly, when "an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level," *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 511 F.3d 1206, 1215 (9th Cir. 2008) (quoting *Abatie*, 458 F.3d at 974), the district court may be required to admit significant new evidence and must, as a practical matter, review de novo. *Saffon*, 511 F.3d at 1217.

Looking only to the administrative record before the Court, the relationship between Qwest and the Reed Group remains unclear. Plaintiff suggests that the Plan is funded and administered by Qwest and that

---

[8] While acknowledging the similarity, the *Abatie* Court nonetheless rejected the sliding scale metaphor as potentially confusing. *Abatie*, 458 F.3d at 967-68.

a conflict of interest therefore exists. [Dkt. #15, pp. 4-5] Defendant notes that Qwest has delegated all power and discretion over claims to a third-party administrator [Dkt. #16, p. 4]. In turn, plaintiff argues that the use of such an administrator, without more, does not negate the conflict of interest. [Dkt. #20, pp. 2-3] Defendant only responds with an assertion that the Reed Group is "a completely separate and independent third-party administrator[.]" [Dkt. #22, p. 2]

Generally speaking, a conflict of interest exists when the plan administrator has an economic incentive to deny meritorious claims. *See Abatie*, 458 F.3d at 965-66; *see also Finley v. Hewlett-Packard*, 379 F.3d 1168, 1175 (10th Cir. 2004). While conflicts of interest most commonly arise under ERISA when the entity making eligibility decisions under the plan is also the payor, this Court does not believe that delegation of claims-handling to a third-party administrator necessarily ameliorates that conflict.[9] For example, if the third-party administrator is incentivized to deny claims through profit sharing or bonuses, the conflict of interest may only be exacerbated by such delegation. *See, e.g., Fiedor v. Qwest Disability Plan*, 498 F.Supp.2d 1221, 1231 (D.Minn. 2007) (Discussing the Reed Group and stating in dicta that if Qwest "otherwise influences the third-party administrator's decision-making process, then a conflict may still exist.").

As such, the absence of any evidence regarding the alleged conflict of interest in this case is especially problematic for the Court. At oral argument, the parties should be prepared to discuss how the absence of extrinsic evidence relating to the alleged conflict of interest impacts the pending motions for summary judgment. The parties should also be ready to suggest the scope of discovery (if any) that appears necessary in light of *Abatie's* indefinite standard of review. *See Abatie*, 458 F.3d at 970 (The district court may "consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest."); *see also id.* at 973 (when procedural irregularities have prevented full development of the administrative record, the court may take additional

---

[9] This Court is aware that at least one other court has held otherwise, specifically as it applies to the relationship between Qwest Disability Services and the Reed Group. *See Sawiers v. Qwest Disability Services, Inc.*, 413 F.Supp.2d 1030 (D.Minn. 2006); *accord Riffey v. Hewlett-Packard Co. Disability Plan*, 2007 WL 946200 (E.D.Cal). Significantly though, the Sawiers court was applying the Eighth Circuit's two-part test announced in *Woo*, which places the burden of proving any conflict on the plaintiff. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998). *Abatie* eliminated the Ninth Circuit's similar two-part test, originally propounded in *Atwood*, which was found to place an "unreasonable burden" of proof on ERISA plaintiffs. *Abatie*, 458 F.3d at 966 (overruling *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317 (9th Cir. 1995)).

ORDER
Page - 6

evidence).

**B.   Should additional evidence be presented regarding Ms. Clark's medical condition?**

ERISA plan administrators are required to set-forth in writing the specific reasons for any claim denial and to afford "full and fair review" to any participant who challenges a denial. 29 U.S.C. § 1133; *Saffon*, 1211 F.3d at 515; *Abatie*, 458 F.3d at 974. An administrator that adds a new reason for denial in its final decision contravenes the purpose of ERISA and violates § 1133. *Id*. Thus, when a new reason for denial is added in the administrator's final decision, the district court must give the plaintiff an opportunity to present evidence on any issues raised for the first time in the final denial. *Saffon*, 511 F.3d at 1215.

In the case at bar, it is not clear to the Court whether Qwest added a new reason for denial during administrative review. In its final denial letter, Qwest relied primarily on the report from RRS and the Transferrable Skills Analysis from Genex, Inc. and concluded that Ms. Clark was not disabled under the terms of the Plan. [AR 0047-50] At least facially, this seems inconsistent with the original stated reason for denial – Ms. Clark's failure to comply with the claims review process. [AR 0039; 0063-64] The parties should be ready to explain whether or not this occurred and whether or not the Court can or should consider additional evidence of Ms. Clark's disability.

**C.   In light of the above, can this case be properly adjudicated on a motion for summary judgment and, if so, is it ripe for such adjudication now?**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When viewing the evidence at the summary judgment stage, all justifiable inferences are drawn in favor of the non-moving party. *Id*. at 255. The standard for summary judgment (even on cross motions) is different than the standard to be applied when conducting a "trial" on the administrative record in an ERISA case. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999). While *Bendixen v. Standard Ins. Co.* holds that "the usual tests of summary judgment . . . do not apply" to an ERISA abuse of discretion review, 185 F.3d 939, 942 (9th Cir. 1999), that case predated the Ninth Circuit's opinions in *Abatie* and *Saffon,* and its holding may no longer be useful. *See, e.g., Saffon*, 511 F.3d 1206 (remanding for bench trial on administrative record despite plan language supporting "abuse of discretion" review).

Therefore, at oral argument, the parties should also be prepared to discuss whether the record is sufficiently developed to permit summary adjudication at this time; if they feel it is not, the parties should be prepared to discuss whether the cross motions for summary judgment should be delayed until some time in the future, or whether a bench trial on the administrative record will be required.

### IV. CONCLUSION

Therefore, IT IS HEREBY ORDERED that oral argument on the cross-motions for summary judgment [Dkt. nos. 15 & 16] is scheduled for Friday, March 21, 2008, at 1:30 p.m.

DATED this 26th day of February, 2008.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE